United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSEPH P. SHELTON,

            Petitioner,

  v.

JOHN C. MARSHALL, Warden,

            Respondent.

_____/

No. C 10-01100 PJH

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

     Before the court is the petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, filed by state prisoner Joseph P. Shelton ("Shelton"). The briefs are fully submitted and the court determines that the matter is suitable for decision without oral argument. Having reviewed the parties' papers and the record, and having carefully considered the relevant legal authorities, the court DENIES the petition.

**BACKGROUND**

**A.    Factual Summary**

     The following factual background of the crimes for which Shelton was convicted summarizes the testimony presented at Shelton's trial.

     Petitioner Joseph Shelton owned 20 acres of land outside Madeline, California, a small town in Lassen County. Answer, Ex. 6 (Reporter's Transcript) ("RT") 52, 183. Shelton lived in a small cabin on the property. RT 190. It had no electricity or running water. RT 864. In early January 1981, Norman Thomas and Ben Silva were living in a trailer on Shelton's property. RT 286, 292-98, 849. Silva was a fugitive; he was rumored to be an executioner and drug manufacturer for the Hell's Angels motorcycle gang. RT 415, 478-79, 556-557, 835. The three men did not work and had no money but subsisted by

1    hunting deer and rabbits. RT 299. They also kept weapons on the property, including a

2    machine gun, shotguns, and automatic rifles. RT 218, 273.

3       Shelton and Silva had talked on different occasions about abducting and raping a girl

4    and concluded that they would have to kill her afterwards. RT 314-316, 427-28, 796-97.

5    On January 11, 1981, Shelton, Silva and Thomas drove a pickup truck to the service

6    station in Madeline. RT 313. While they were at the gas station, they saw Kevin Thorpe

7    and Laura Craig. RT 313. Thorpe and Craig were driving together to Oregon, where

8    Thorpe was planning to attend college. RT 163, 177. Thorpe had packed the trailer with all

9    of the couple's belongings, including furniture and household goods. RT 162-164. Their

10    dog was also in the car. RT 347. They had stopped in Madeline to change a flat tire. RT

11    313.

12       Shelton said Craig was very pretty, and Silva remarked that he would like to have

13    her. RT 314, 856. Silva and Shelton decided to kidnap Thorpe and Craig. RT 320-21.

14    They had talked about the possibility of bringing them up to Shelton's property and killing

15    them. RT 316, 320. They drove down the road and waited in the pickup truck for Thorpe

16    and Craig to pass. RT 320. The three men agreed that Shelton would drive the pickup

17    truck while Silva and Thomas would take over the couple's car. RT 322. All three men

18    were armed. RT 323-324.

19       Shelton, Silva and Thomas followed Thorpe and Craig after they drove by. RT 321.

20    Shelton and Silva had bought a red spotlight specifically for this purpose, and they directed

21    the light at the couple's car to simulate the lights from a police car. RT 325, 797, 858-59.

22    Thorpe and Craig pulled over to the side of the road. RT 325. Silva and Thomas ran up to

23    the couple's car. Silva stuck the shotgun in Thorpe's face and made him move over. RT

24    333. Silva and Thomas got into the car. Holding Thorpe at gunpoint, Silva drove the

25    couple's car to Shelton's property. RT 335. Shelton followed in the pickup. RT 335.

26       When they arrived at the property, Shelton and Silva took the couple into the cabin

27    while Thomas moved Thorpe's car. RT 339, 341. Thomas shot and killed the couple's

28    dog. RT 347. Then, while Thomas watched the couple in the cabin, Shelton and Silva took

United States District Court

For the Northern District of California

1  everything out of the couple's car and brought them into the cabin.  RT 342-343.  Shelton

2  and Silva took Thorpe outside and chained him to a tree, where he spent the night.  RT

3  348, 354.  Silva took Thorpe's money and split it three ways with Thomas and Shelton.  RT

4  361.  Thomas drove Thorpe's car to the highway, followed by Silva.  Silva took out the

5  battery from Thorpe's car; Thomas and Silva wiped the car for fingerprints, slashed a tire

6  and abandoned it.  RT 352-53.  They returned to the cabin.

7       Shelton took Craig into the bedroom and had sex with her.  RT 352, 804.  He kept

8  her in the room all night.  RT 358.  The next morning, Shelton and Silva walked out to the

9  burn barrel, where they burned some of the couple's belongings.  RT 359, 364.  Shelton

10  returned to the cabin to tell Thomas to turn on the stereo, and went back outside.  Then

11  Silva came back to the cabin to tell Thomas to turn up the volume higher, and went back

12  outside.  RT 359-361, 468.  Thomas stayed in the cabin to keep an eye on Craig.  He also

13  had sexual intercourse with her.  RT 363.

14       Shelton and Silva unchained Thorpe and walked him up the side of the hill.  Shelton

15  was armed with a .44 magnum pistol.  RT 372.  Thomas testified that Shelton was laughing

16  and seemed to be in a good mood when he returned to the cabin.  RT 364, 374.  He

17  recounted all the details of the murder to Thomas.  RT 364, 374.  Shelton stayed with

18  Thorpe while Silva went back to his trailer and returned with an Ingram machine gun.  RT

19  372.  Shelton was armed with a .44 Magnum when he watched Thorpe.  RT 373.  Thorpe

20  cried and begged for his life, but Shelton told him to take a look at the mountain because it

21  would be the last thing he would see.  RT 372.  When Silva returned with the machine gun,

22  Shelton jumped behind a tree because he was afraid Silva would shoot from a distance and

23  that the bullets from the machine gun would hit him.  RT 372, 872.  Silva instead walked

24  right up to Thorpe and emptied a full clip of 30 bullets into him.  RT 372, 872.  Thorpe was

25  standing and fell over only after Silva had emptied the clip.  RT 374.  Thorpe's hand

26  continued to twitch.  RT 374.  Silva reloaded and shot another half clip into Thorpe.  RT

27  374.  He then handed the machine gun to Shelton, and Shelton fired the rest of the clip at

28  Thorpe.  RT 735-36.  Shelton recalled that one of the bullets he fired struck Thorpe in the

3

United States District Court

For the Northern District of California

1  eye, but later recanted that statement at trial.  RT 736, 754, 798-99, 873, 1030.  They left

2  Thorpe's body on the side of the hill and returned to the cabin.  RT 737-38.

3       Silva and Thomas walked back up the hill, and Silva told Thomas to bring an axe.

4  RT 365, 367.  Shelton went back to bed with Craig.  RT 366.  Thomas saw Kevin Thorpe's

5  body on the side of the hill, riddled with bullet holes.  RT 367.  Silva ordered Thomas to use

6  his axe to cut up Thorpe's body and to put the pieces into trash bags.  RT 368.  With Silva

7  staying to watch, Thomas took over two hours to dismember Thorpe.  RT 368, 479-80.

8  Silva and Thomas took the trash bags to Spooner Reservoir and buried them all around the

9  area.  RT 376.  Thorpe's clothing, as well as the axe used to cut up his body, were all

10  burned at the burn barrel.  RT 371.

11       The men kept Laura Craig inside the cabin for two to four days.  RT 382.  She never

12  left the cabin during that time.  RT 382.  They kept a close watch on her, and Shelton

13  became very angry with Thomas when he left Craig unguarded for a few moments.  RT

14  385.  Shelton and Silva decided to take Craig to Oakland to see Sonny Barger, the leader

15  of the Hell's Angels.  RT 387-388.  Before they left with Craig, they told Thomas to clean up

16  the outside of the cabin and remove the victims' property from inside the cabin.  RT 390.

17       Shelton admitted that Silva told him that Craig would be killed and mentioned killing

18  her with a baseball bat.  RT 799.  When they left the cabin on or about January 14, 1981,

19  Silva was driving his yellow four-wheel drive truck with Craig sitting between him and

20  Shelton, who was on the passenger side.  RT 388-89, 711, 967.  When they left, Shelton

21  saw Silva put a baseball bat in the truck and felt ninety percent sure that Craig was taken to

22  be killed.  RT 799-800.  Rather than driving to Oakland, Silva drove north to Mt. Shasta.

23  RT 392.  On the way, they stopped at a gas station where Silva went inside to buy a can of

24  soda for Craig, while Shelton stayed in the truck with her.  RT 741-42, 998.  When they

25  later stopped off on the side of the road to change drivers, Shelton walked around the back

26  of the pickup truck while Craig stayed in the pickup.  RT 392.  Shelton heard a gunshot and

27  Craig screamed.  RT 392, 712, 882.  Silva pulled Craig out of the truck by her hair and shot

28  her in the back of the head.  RT 392-93, 882.  He then dragged her body down a hill, and

United States District Court

For the Northern District of California

1   Shelton helped him cover her body with dirt and leaves.  RT 883.  Shelton also tried to take

2   Craig's rings to give to his wife, but he couldn't get them off of Craig's fingers.  RT 394.

3   Shelton and Silva returned to Madeline but left again soon afterwards.  RT 395, 398.

4   They instructed Thomas to hide the weapons.  RT 398.  A few days later, however, on

5   January 23, 1981, Thomas was taken into custody for a probation violation.  RT 57, 401,

6   630.  He informed the police about the murder of Kevin Thorpe and told them where to find

7   the parts of his body.  RT 64.  Investigators went to the Spooner Reservoir area and

8   uncovered the plastic bags containing Thorpe's body parts that had been buried in the

9   ground.  RT 672-74.  Investigators also searched Shelton's property and recovered items in

10  a burn barrel, including Thorpe's car keys and belt buckle.  RT 675-79.  The investigators

11  searched the trailer, about one to three hundred yards from the cabin, and found the fully

12  automatic .38 caliber pistol that was used to kill Thorpe.  RT 664, 680, 690, 692-93.  Near

13  the trailer, investigators found a burn pit with expended .38 shell casings from the Thorpe

14  murder weapon.  RT 693-94.  In the area near the burn site, investigators found hair and

15  blood samples belonging to Thorpe.  RT 698.  A fingerprint expert accompanied the

16  investigation of Shelton's cabin and found latent fingerprints on several items inside the

17  cabin that he later determined to be Shelton's prints.  RT 649, 700, 650, 654-55.  Arrest

18  warrants were issued for the arrest of Shelton and Silva.

19  Shelton claimed that at about this time he became frightened of Silva and was

20  convinced Silva was trying to kill him.  RT 905.  On January 31, 1981, Shelton turned

21  himself in to the Placer County Sheriff's Office in Auburn.  RT 229, 913.  Shelton made

22  several statements to the police.  RT 706-713, 714-715, 732-754, 796-800.  Shelton also

23  agreed to lead the police to the body of Laura Craig.  RT 230.  They found the remains of

24  Craig's body near Damnation Pass in Shasta County.  RT 233.

25  While they were incarcerated in county jail, Shelton passed several notes to

26  Thomas.  RT 406, 510.  Shelton told Thomas not to talk to the police.  He also said that

27  Thomas should blame Silva for the crime and "say he kept telling you he was going to kill

28  you . . . and me [Shelton] . . . and all your friends and relatives."  RT 513.  Shelton

United States District Court
For the Northern District of California

1   instructed Thomas to "keep playing crazy," and that if he maintained Shelton's story,

2   Shelton's lawyer could get Thomas out in a year or Shelton himself would break Thomas

3   out of jail.  RT 511, 513.  Shelton admitted in one note about lying to the police, and "the

4   way things stand right now, they don't have anything that even says I was there."  RT 574.

5          At trial, Shelton testified on his own behalf.  He claimed he was under the influence

6   of drugs during the entire time he spent with Silva.  RT 913.  Although Shelton admitted to

7   having discussions about kidnapping a girl, he claimed he was not armed when the crimes

8   were committed.  RT 861, 1002.  Shelton testified that he did not know they were going to

9   kill either Thorpe or Craig.  RT 870, 882.

10  **B.    Procedural History**

11         In November 1981, a Mendocino County jury convicted Shelton of one count of first

12  degree murder and one count of second degree murder under California Penal Code

13  section 187, two counts of kidnapping under section 207, two counts of theft under sections

14  487 and 484, one count of possession of a machine gun under section 12022, and one

15  count of possession of a silencer under section 12520.  The jury also found true special

16  circumstances that fixed the penalty for the first degree murder at life without the possibility

17  of parole.  Shelton was sentenced to life without possibility of parole for first degree murder,

18  with a consecutive term of 15 years to life for second degree murder.  The California Court

19  of Appeal affirmed the conviction but modified Shelton's sentence to include the possibility

20  of parole.  The California Supreme Court denied review.  On resentencing, Shelton's

21  sentence for first degree murder was reduced to 25 years to life imprisonment.

22         On November 8, 1991, Shelton filed pro se his first federal habeas petition in this

23  court.  *See Shelton v. Estelle*, Case No. C 91-3948 FMS.  In that case, Shelton raised two

24  claims: (1) that statements that he made to law enforcement officers in February 1981

25  should have been suppressed due to the delay in arraigning him; and (2) the trial court

26  erred in failing to instruct the jury on diminished capacity where kidnapping was the felony

27  on which the felony-murder instruction was based.

28

United States District Court

For the Northern District of California

On November 12, 1992, the court denied the first claim and noted that Shelton had procedurally defaulted the second claim.  The court afforded Shelton thirty days to demonstrate cause and prejudice for the default, and advised him that if he failed to do so, the claim would be dismissed.  Instead of doing so, Shelton filed a notice of appeal and a request for a certificate of probable cause.  On December 2, 1992, the court subsequently denied the request for a certificate of probable cause, noting that an appeal was not timely until his December 12, 1992 deadline for showing cause and prejudice for the procedural default had expired.  Shelton again failed to do so, and on December 16, 1992, the court dismissed the second claim, denied the first claim, and issued a judgment in the case.  On December 15, 1993, the Ninth Circuit issued a memorandum opinion dismissing the appeal from the November 1992 order as premature.  On February 25, 1994, the Ninth Circuit dismissed the appeal from the district court's final order dismissing Shelton's habeas petition.

Shelton's codefendant, Benjamin Wai Silva, was tried separately in San Bernardino County in January 1982.  In 2002, the Ninth Circuit issued its first decision in Silva's appeal of the district court's denial of his habeas petition.  The Ninth Circuit affirmed in part, reversed in part and remanded Silva's case to the district court for a determination as to whether the state had suppressed *Brady* evidence favorable to him and whether the evidence was material.  *Silva v. Woodford*, 279 F.3d 825, 855 (9th Cir. 2002) ("*Silva I*"); *see Brady v. Maryland*, 373 U.S. 83 (1963).  On remand, the district court determined that the undisclosed evidence was cumulative and not material, and thus no *Brady* violation had occurred.

Silva appealed the district court's decision on remand, and in 2005, the Ninth Circuit reversed the district court's denial of Silva's habeas petition, concluding that a *Brady* violation had occurred.  The court remanded the case to the district court with instructions to grant the writ as to Silva's murder conviction, but left Silva's other convictions for kidnapping, robbery, and a firearms violation intact.  *Silva v. Brown*, 416 F.3d 980, 991 (9th Cir. 2005) ("*Silva II*").

United States District Court

For the Northern District of California

1    Relying on the holding of *Silva II*, Shelton filed habeas petitions in the state courts,

2  which denied habeas relief.  Answer, Exs. 3-5.  On June 25, 2007, Shelton filed another

3  habeas petition in the Eastern District of California, raising a *Brady* claim in reliance on the

4  Ninth Circuit's decision in *Silva II*.  On September 23, 2008, the court dismissed the petition

5  based on Shelton's failure to obtain permission from the Ninth Circuit to file a second or

6  successive petition.

7    Meanwhile, Shelton obtained permission from the Ninth Circuit to file a second or

8  successive habeas petition.  In support of that application, Shelton contended that there

9  was cause based on new evidence in the case, namely, evidence that he had failed to

10  discover until the Ninth Circuit issued its 2005 decision in *Silva II*.  Shelton asserted that

11  from the opinion in *Silva II*, he had learned that the prosecution in his case made a deal

12  with defense witness Norman Thomas, a co-participant in the crimes.  The deal required

13  that Thomas, who several years prior to Silva's and Shelton's trials had been involved in a

14  motorcycle accident and suffered severe brain damage, not undergo a psychiatric

15  evaluation before testifying at Silva's and Shelton's trials.  *See Silva II*, 416 F.3d at 984.

16  On November 4, 2008, in a summary order, the Ninth Circuit granted Shelton's request to

17  file a second or successive petition in district court.  Answer, Ex. 2.

18    On December 17, 2008, Shelton filed pro se the instant federal habeas petition in

19  the United States District Court for the Eastern District of California, which transferred it to

20  this court on March 18, 2010.  At the time the case was transferred to this court, a motion

21  to appoint counsel was pending.  Following transfer, on October 22, 2010, the court

22  granted Shelton's motion to appoint counsel, noting that based on the Ninth Circuit's

23  decision in *Silva II*, it appeared that Shelton's claims may have merit, and that establishing

24  a factual basis for them may be difficult for an incarcerated layperson.  The court declined

25  to set further filing deadlines until appointed counsel had entered an appearance.

26    On November 18, 2010, William L. Osterhoudt was appointed as counsel for

27  Shelton.  On August 1, 2011, the state moved to dismiss Shelton's current petition.  Shelton

28  filed an opposition to the motion, and the state did not file a reply.  The court denied the

United States District Court

For the Northern District of California

1 | motion to dismiss by order entered March 15, 2012.  Respondent subsequently filed a

2 | motion for reconsideration of the court's order denying the motion to dismiss, which the

3 | court denied by order entered June 14, 2012.

4 | After requesting, and being granted, two extensions of time by which to file an

5 | answer, respondent filed an answer to the habeas petition on December 12, 2012.  Shelton

6 | filed a traverse on February 11, 2013.

### ISSUES PRESENTED

8 | Shelton raises the following claims for habeas relief:

9 | (1) The prosecutor's failure to disclose that the plea agreement with Thomas

10 | required Thomas not to undergo a psychiatric evaluation, before he testified

11 | in Shelton's trial, violated Shelton's due process rights under *Brady v.*

12 | *Maryland*, 373 U.S. 83 (1963).

13 | (2) Trial counsel's failure to uncover the prosecutor's deal with Thomas's attorney

14 | constituted ineffective assistance of counsel.

### STANDARD OF REVIEW

16 | A district court may not grant a petition challenging a state conviction or sentence on

17 | the basis of a claim that was reviewed on the merits in state court unless the state court's

18 | adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

19 | unreasonable application of, clearly established Federal law, as determined by the

20 | Supreme Court of the United States; or (2) resulted in a decision that was based on an

21 | unreasonable determination of the facts in light of the evidence presented in the State court

22 | proceeding."  28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to

23 | mixed questions of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407–09, (2000),

24 | while the second prong applies to decisions based on factual determinations, *Miller–El v.*

25 | *Cockrell*, 537 U.S. 322, 340 (2003).

26 | A state court decision is "contrary to" Supreme Court authority, that is, falls under the

27 | first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that

28 | reached by [the Supreme] Court on a question of law or if the state court decides a case

9

United States District Court

For the Northern District of California

differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412–13.  A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.  Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  '[E]valuating whether a rule application [i]s unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.*  "As a condition for obtaining habeas corpus [relief] from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller–El*, 537 U.S. at 340. Review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

**DISCUSSION**

**A.    Legal Standard**

Shelton alleges that his due process rights were violated by the prosecution's failure to disclose impeachment material, which he contends was required under *Brady v.*

United States District Court
For the Northern District of California

*Maryland*, 373 U.S. 83 (1963).  "To establish a *Brady* violation, the evidence must be (1) favorable to the accused because it is either exculpatory or impeachment material; (2) suppressed by the government, either willfully or inadvertently; and (3) material or prejudicial."  *United States v. Blanco*, 392 F.3d 382, 387 (9th Cir. 2004) (citing *Benn v. Lambert*, 283 F.3d 1040, 1052-53 (9th Cir. 2002)).

Impeachment evidence is exculpatory evidence within the meaning of *Brady*.  *Id.* (citing *Giglio v. United States*, 405 U.S. 150, 154 (1972)).  "*Brady/Giglio* information includes material that bears on the credibility of a significant witness in the case."  *Id.* (citation and quotation marks omitted).  Impeachment evidence is favorable to the accused under *Brady/Giglio* "when the reliability of the witness may be determinative of a criminal defendant's guilt or innocence."  *Id.* (citation and quotation marks omitted).

The terms "material" and "prejudicial" are used interchangeably to describe the third component of a *Brady* claim.  *Bailey v. Rae*, 339 F.3d 1107, 1116 n. 6 (9th Cir. 2003).  *See also Benn*, 283 F.3d at 1053 n. 9 ("Evidence is not 'material' unless it is 'prejudicial,' and not 'prejudicial' unless it is 'material'").  The "touchstone of materiality is a 'reasonable probability' of a different result."  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).  This reasonable probability is "shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'"  *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).  A determination of materiality under the *Brady* standard requires the evidence to be considered collectively, and in light of the strength of the prosecution's case.  *Kyles*, 514 U.S. at 434.  *See also Barker v. Fleming*, 423 F.3d 1085, 1100 (9th Cir. 2005).

The ultimate question of materiality is not whether the defendant would more likely than not have received a different verdict with the evidence; rather, it is whether, in its absence, he received a fair trial, "understood as a trial resulting in a verdict worthy of confidence."  *Kyles*, 514 U.S. at 434.  *See United States v. Olsen*, 704 F.3d 1172 (9th Cir. 2013)  (despite government's failure to disclose witness's investigation file that was favorable to defense, viewing the evidence in the context of the entire record, there was no

United States District Court
For the Northern District of California

1    reasonable probability that, even if the evidence had been disclosed, the result of the

2    proceeding would have been different); *United States v. Zuno-Arce*, 339 F.3d 886, 890-91

3    (9th Cir. 2003) (*Brady/Bagley* claim rejected because, even assuming that evidence was

4    both favorable and undisclosed, petitioner could not show prejudice because there was no

5    reasonable probability that, had it been disclosed, the evidence would have made a

6    difference to the outcome of the trial).  A violation will be found under *Brady* by showing

7    that the favorable evidence could reasonably be taken to put the whole case in such a

8    different light as to undermine confidence in the verdict.  *See Kyles*, 514 U.S. at 435.

9    **B.    *Silva II* Ruling**

10          Shelton contends that the prosecution violated its duty to disclose material

11   exculpatory evidence by failing to disclose its deal with Thomas's attorney, who agreed not

12   to have Thomas psychiatrically examined until after Thomas had testified at both Shelton's

13   and Silva's trials.  Shelton bases his *Brady* claim on the holding of *Silva II*, where the court

14   of appeals found that the evidence about this condition of Thomas's plea agreement was

15   material under *Brady*.  416 F.3d at 986-87.

16          Unlike Shelton's present habeas petition, Silva's habeas petition was filed before the

17   effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  The

18   court of appeals therefore reviewed Silva's *Brady* claim under the pre-AEDPA standard of

19   review.  "Under pre-AEDPA standards, 'state court judgments of conviction and sentence

20   carry a presumption of finality and legality and may be set aside only when a state prisoner

21   carries his burden of proving that his detention violates the fundamental liberties of the

22   person, safeguarded against state action by the Federal Constitution.'"  *Silva II*, 416 F.3d at

23   985 (citing *Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (en banc)).

24          On appeal from the district court's denial of Silva's habeas petition, the court of

25   appeals determined that "[t]he primary evidence regarding Silva's role in Thorpe's death

26   came from Thomas."  *Silva I*, 279 F.3d at 828.  The court summarized Thomas's testimony

27   in Silva's trial as follows:

28

. . . Thomas testified that both Silva and Shelton left the cabin in the morning after the kidnapings [sic], and that Thorpe was murdered while Thomas was having consensual sex with Craig.  According to Thomas, Silva then returned to the cabin and forced Thomas to dismember and dispose of Thorpe's body.  Subsequently, the three men were standing over a barrel in which some of Thorpe's belongings were being burned, when Shelton allegedly proceeded to describe to Thomas how Thorpe had died.  Shelton related how he and Silva had unlocked the chain linking Thorpe to the tree and led him terrified and crying up the side of a hill.  After leaving briefly to obtain a weapon, Silva then walked up behind Thorpe and shot him up and down his body at close range, using an Ingram M-11 .38 caliber fully automatic pistol equipped with a silencer.  Silva then gave the weapon to Shelton, who emptied the rest of the magazine clip into Thorpe's body.  According to Thomas, Silva simply looked on and smiled as Shelton described the slaying to Thomas.

Thomas also testified that several days after Craig's disappearance, a similar conversation took place while the three were gathered on the porch of the cabin, in which Shelton described how Craig had been shot and killed.  Once again, Silva allegedly looked on and smiled while Shelton spoke to Thomas.

*Silva I*, 279 F.3d at 828-29.  Silva raised a *Brady* claim, contending that prosecutors improperly struck a deal with Thomas's attorney, whereby he would refrain from conducting a psychiatric evaluation of his client until after Thomas testified at Silva's trial.[1]  *Id.* at 829.

With respect to Silva's *Brady* claim, the court held that Thomas's credibility was "a critical issue, given that he was the only witness who could identify Silva as the trigger man in Thorpe's murder."  *Silva I*, 279 F.3d at 854-55.  The court determined that "even if the defense could not have compelled Thomas to undergo a psychiatric examination, the very fact that the prosecution struck such a deal (if true as alleged) could by itself have undermined Thomas's credibility before a jury.  Put another way, the jury would have been made aware of the potentially devastating fact that the state itself doubted Thomas's mental competency."  *Id.* at 855.  Applying the pre-AEDPA standard of habeas review, the court of appeals remanded the habeas petition for an evidentiary hearing on Silva's *Brady*

---

[1]  Silva also raised an ineffective assistance claim for trial counsel's purported failure to impeach or to otherwise challenge Thomas's reliability as a witness, where Thomas had been involved in a motorcycle accident several years earlier and suffered severe brain damage.  The court of appeals affirmed denial of Silva's claim for ineffective assistance with regard to the guilt phase but reversed the denial of his claim for ineffective assistance at the penalty phase.  *Silva I*, 279 F.3d at 855.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

claim to determine the veracity of Silva's allegations regarding the prosecution's

undisclosed deal with Norman Thomas.  *Id.* at 855.

After holding an evidentiary hearing on remand, the district court found that Silva's

allegations regarding the prosecutor's deal with Thomas's attorney were true:

> Thomas's attorney, Rex Gay, stated in his declaration that at the time of Thomas's arraignment, he had imminent plans to have Thomas psychiatrically evaluated, because he believed Thomas "was either unable to cooperate in his own defense, or insane."  Gay made his plans known to the district attorney, who agreed with Gay that Thomas's testimony would be necessary to convict Silva (and Shelton), and that having Thomas psychiatrically evaluated would "supply ammunition to the defense."  Gay and the district attorney then struck a bargain under which Thomas would not be psychiatrically examined, and in return the district attorney would drop the murder charges in exchange for Thomas's testimony.

*Silva II*, 416 F.3d at 984.  The district court concluded, however, that the undisclosed

agreement was not material under *Brady* and denied relief on that claim.

The court of appeals reversed the district court's denial of Silva's *Brady* claim and

remanded with instructions to grant the habeas writ with respect to his murder conviction.

*Id.* at 992.  The court of appeals held that the undisclosed evidence was material, that is,

"'the favorable evidence could reasonably be taken to put the whole case in such a different

light as to undermine confidence in the verdict.'"  *Id.* at 986 (citing *Kyles*, 514 U.S. at 435).

The appellate court determined that Thomas's testimony was "crucial" because he was "the

only witness who provided an account of how Thorpe's murder took place and the only

witness who identified Silva as his killer."  *Id.* at 987.  Because the prosecution's deal

foreclosing Thomas's psychiatric evaluation bore directly on his competence and credibility,

the court concluded that the undisclosed evidence was material under *Brady*, reasoning as

follows:

> the fact of the prosecution's undisclosed deal with Thomas, had it been presented to the jury, would have put the testimony of this critical witness in a substantially different light, both directly, by casting doubt on the accuracy of Thomas's testimony, and indirectly, by inducing the defense to focus the jury's attention on Thomas's lapses and inconsistencies and by calling into question the prosecutor's faith in the competence of his own witness.

*Silva II*, 416 F.3d at 988.

United States District Court

For the Northern District of California

**C.      Application of *Brady* Standard and *Silva II* Ruling to Shelton's Claim**

Respondent does not dispute the factual findings of *Silva II* regarding the previously undisclosed existence of the prosecution's deal with Thomas's attorney.  As in *Silva II*, there is no dispute here that "the first two *Brady* elements - that the evidence is favorable to the accused and that it has been suppressed by the government - have been established" by the prosecutor's failure to disclose that Thomas was required not to undergo a psychiatric evaluation before he testified in Shelton's trial.  *See Silva II*, 416 F.3d at 986. "The only question the parties debate is whether it was material." *Id.*

Shelton contends that *Silva II* is controlling on the issue of materiality here, and that he is entitled to habeas relief on his *Brady* claim.  However, the court finds that *Silva II* is distinguishable on two significant grounds.  First, unlike Silva's pre-AEDPA *Brady* claim, Shelton's habeas petition is governed by the highly deferential standard of review established by AEDPA. Second, Thomas was not a crucial witness in Shelton's trial, where Shelton testified in his own defense, unlike Silva's trial where Thomas's testimony concerning Shelton's account of Thorpe's murder was uncorroborated anywhere else in the record.  *See Silva II*, 416 F.3d at 987.

**1.      AEDPA Standard of Review**

On habeas review of a state court's ruling under AEDPA, the district court may grant habeas relief, not if the state court incorrectly applied federal law, but only if the state court's determination was unreasonable, a substantially higher threshold.  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)). In *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011), the Supreme Court articulated the AEDPA standard of review as follows:

> As amended by AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner.  Section 2254(a) permits a federal court to entertain only those applications alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States."  Sections 2254(b) and (c) provide that a federal court may not grant such applications unless, with certain exceptions, the applicant has exhausted state remedies.

1

2

3

         If an application includes a claim that has been "adjudicated on the merits in State court proceedings, § 2254(d), an additional restriction applies.  Under § 2254(d), that application "shall not be granted with respect to [such a] claim . . . unless the adjudication of the claim":

4

5

6

      "(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

7

      "(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

8

9

10

11

This is a "difficult to meet," *Harrington v. Richter*, 562 U.S. —, — , 131 S.Ct. 770, 786,  (2011), and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (citation and internal quotation marks omitted).  The petitioner carries the burden of proof.  *Id.*, at 25.

12 To warrant relief under the "unreasonable application" clause, "[a]s a condition for obtaining

13 habeas corpus from a federal court, a state prisoner must show that the state court's ruling

14 on the claim being presented in federal court was so lacking in justification that there was

15 an error well understood and comprehended in existing law beyond any possibility for

16 fairminded disagreement."  *Richter*, 131 S. Ct. at 786-87.  "In other words, a state court's

17 inappropriate application of the law does not warrant habeas relief under this prong unless

18 the error was unreasonable. Thus, federal courts are precluded from granting relief under

19 this prong 'so long as "fairminded jurists could disagree" on the correctness of the state

20 court's decision.'"  *Cudjo v. Ayers*, 698 F.3d 752, 762 (9th Cir. 2012) (citing *Richter*, 131 S.

21 Ct. at 786), *petition for certiorari filed* February 4, 2013.

22       Because *Silva II* was decided under a pre-AEDPA standard of review, the holding of

23 *Silva II* does not control habeas review of Shelton's conviction under AEDPA.

24       **2.**   ***Brady*'s Materiality Requirement**

25       Viewed in the context of the entire record, the undisclosed evidence of the

26 prosecution's deal with Thomas is not material because had it been disclosed, there is no

27 reasonable probability that the result of Shelton's trial would have been different.  Shelton

28

United States District Court

For the Northern District of California

1   fails to demonstrate that the state court's denial of his *Brady* claim is either contrary to, or

2   an unreasonable application of, clearly established federal law.

3                              **a.    "Contrary To" Challenge**

4          Shelton contends that the state court's decision denying his *Brady* claim was both

5   objectively unreasonable and contrary to clearly established federal law.  In the last

6   reasoned state court decision denying Shelton's *Brady* claim, the superior court held as

7   follows:

8               Petitioner, in the custody of the California Department of
            Corrections and Rehabilitation, alleges that an alleged *Brady* error at
9           his trial justifies an Order for an evidentiary hearing into the question,
            and suggests an appropriate remedy such as new trial or
10          modification of his sentence.  He cites *Silva v. Brown* in which his co-
            defendant was held by the Ninth Circuit to have been denied a fair
11          trial by the concealment of an alleged deal between the District
            Attorney and the counsel for a third defendant, Normal [sic] Thomas,
12          not to have Thomas' mental capacity investigated prior to his
            testimony against his co-defendants.  Thomas' testimony identified
13          Silva rather than petitioner as the triggerman; it is difficult to conclude
            that anything favorable to petitioner was suppressed.  The petitioner
14          for habeas corpus, as well as the motion for modification of sentence
            are denied.

15

16  Answer, Ex. 3.

17         To support his contention that the state court's decision was contrary to clearly

18  established federal law, Shelton argues that the state court expressly stated that the

19  withheld evidence was not "favorable" to Shelton, referring to the first *Brady* element, and

20  failed to mention the other *Brady* elements.  Traverse at 7.  "A state court decision is

21  'contrary to' clearly established Supreme Court precedent if the state court applies a rule

22  that contradicts the governing law set forth in Supreme Court cases *or* if the state court

23  confronts a set of facts materially indistinguishable from those at issue in a decision of the

24  Supreme Court and, nevertheless, arrives at a result different from its precedent."  *Moses

25  v. Payne*, 555 F.3d 742, 750 (9th Cir. 2009) (citing *Lambert v. Blodgett*, 393 F.3d 943, 974

26  (9th Cir. 2004)).  The state court's holding that "it is difficult to conclude that anything

27  favorable to petitioner was suppressed" does not set forth a full analysis under *Brady*, but

28  cites *Brady* as the controlling authority.  Answer, Ex. 3.  Thus, Shelton has not

                                            17

United States District Court

For the Northern District of California

1  demonstrated that the state court decision applied a rule of law that contradicted clearly

2  established federal law.

3        Shelton also argues that the state court concluded that the evidence of the

4  prosecution's undisclosed agreement was not favorable, contradicting clearly established

5  federal law that impeachment evidence is favorable to the defense under the first element

6  of *Brady*.  Traverse at 6-7 (citing *Giglio,* 405 U.S. at 154).  Although the state court used the

7  phrase "favorable to petitioner," the decision does not expressly hold that the undisclosed

8  evidence failed to satisfy the first *Brady* element.  A reasonable basis for the state court's

9  denial is that the evidence at issue did not satisfy the third *Brady* requirement of materiality.

10  Shelton cites no Supreme Court precedent that would be contradicted by the state court's

11  determination that the evidence at issue was not material.  "Where a state court's decision

12  is unaccompanied by an explanation, the habeas petitioner's burden still must be met by

13  showing there was no reasonable basis for the state court to deny relief.  This is so whether

14  or not the state court reveals which of the elements in a multipart claim it found insufficient,

15  for § 2254(d) applies when a "claim," not a component of one, has been adjudicated.

16  *Richter*, 131 S. Ct. at 784.  By denying Shelton's *Brady* claim, the state court's ruling was

17  not, as Shelton contends, "contrary to" clearly established federal law.

18              **b.    "Unreasonable Application" Challenge**

19        Shelton contends that the undisclosed evidence of the prosecution's agreement with

20  Thomas's attorney, to postpone Thomas's psychiatric exam until after he testified, satisfies

21  *Brady*'s materiality requirement, and that the state court's decision was an unreasonable

22  application of clearly established federal law.  Shelton contends that Thomas's testimony

23  was critical to the prosecution because Thomas provided powerful evidence that Shelton

24  had the requisite intent to commit kidnapping and murder, and the prosecution urged the

25  jury to believe Thomas's testimony over Shelton's.  In particular, Shelton argues that

26  Thomas's testimony discredited Shelton's claim that he had been drunk and so impaired by

27  drug use that he didn't remember much about the murders.  Shelton argues that the

28  prosecution withheld evidence about Thomas's competence that would have provided a

United States District Court
For the Northern District of California

1   new and different form of impeachment that was not introduced at trial, and was therefore

2   material under *Brady*.

3        Upon review of the trial record, the court determines that the undisclosed

4   impeachment evidence about the agreement to postpone Thomas's psychiatric evaluation

5   could not reasonably be taken to put the whole case in such a different light as to

6   undermine confidence in the verdict, in light of Shelton's own admissions, his jailhouse

7   notes to Thomas, and the forensic evidence introduced at trial.  "For purposes of

8   determining prejudice, . . . the withheld evidence must be analyzed in the context of the

9   entire record."  *Olsen*, 704 F.3d at 1184 (citing *Benn*, 283 F.3d at 1053) (internal quotation

10  marks omitted).  With respect to the kidnapping charge, Shelton admitted that he helped

11  Silva and Thomas execute a plan to kidnap Thorpe and Craig by using a simulated police

12  light to pull them over and take the victims in their car to Shelton's cabin, while Shelton

13  followed them in Silva's truck.  With respect to the murder charges, Shelton admitted that

14  he accompanied Silva when Silva shot and killed Thorpe and Craig, several days apart.

15  Shelton told an investigator that after Silva shot Thorpe with a machine gun, Shelton also

16  fired Silva's machine gun at Thorpe, admitting that at least one bullet hit Thorpe.  Shelton

17  also admitted that when he and Silva drove away with Craig on the day of her death, he

18  was ninety percent sure that Craig was being taken to be killed, and admitted that he

19  stayed in the truck with her when Silva left them briefly to buy a soda.  With respect to the

20  theft offenses, Shelton admitted to taking the victims' money and personal property, even

21  wearing Thorpe's boots when he turned himself into the authorities.  Shelton's fingerprints

22  were also found on the victims' car stereo.  After Shelton turned himself in, he passed

23  jailhouse notes to Thomas, admitting that he lied to the police and instructing Thomas to

24  blame Silva for the crimes and tell the police that Silva threatened to kill Thomas, Shelton

25  and their friends and relatives.

26       The state court record underlying Shelton's conviction is readily distinguishable from

27  the record supporting the court's finding of *Brady* error in *Silva II*.  Here, the state court

28  could have reasonably concluded that the prosecutor's failure to disclose the prosecution's

United States District Court

For the Northern District of California

plea deal with Thomas was not material under *Brady* because Shelton's own admissions were sufficient to establish at a minimum that he aided and abetted Silva in committing the crimes. The record reflects that the jury was instructed that "one who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged." RT 1176. In light of this record containing overwhelming evidence of Shelton's guilt as to kidnapping, theft and murder, Shelton has not presented a reasonable probability that disclosure of the Thomas impeachment evidence would have led to a different result. *Cf. Gonzalez v. Wong*, 667 F.3d 965, 982 (9th Cir. 2011) (finding colorable *Brady* claim where prosecution failed to disclose reports prepared by prison psychologists undermining credibility of government witness who testified that defendant had confessed all the key facts that the state argued made his crime worthy of the death penalty), *cert. denied*, 133 S. Ct. 155 (2012).

In *Gonzalez*, the court undertook a two-step inquiry to determine whether suppressed impeachment evidence is material under *Brady*: "First, we ask whether a reasonable state court could conclude that there was a reasonable probability that the new evidence would have changed the way in which the jurors viewed [the witness's] testimony. . . . We then ask whether a reasonable state court could conclude that there was a reasonable probability that this change would have resulted in a different verdict. *Gonzalez*, 667 F.3d at 982. The court applies that two-step materiality analysis here.

### i.     Jurors' View of Thomas

Shelton has established a reasonable probability that the evidence of the prosecution's agreement with Thomas's attorney to postpone his mental evaluation would have changed the way that the jurors would have viewed his testimony. At trial, Thomas admitted that he had been in a motorcycle accident that resulted in a brain injury that left him unconscious for about thirty days. RT 450. Defense counsel cross-examined Thomas on his resulting difficulty with his speech and his memory, *id.*, as well as the prosecution's leniency in exchange for his cooperation and testimony against Shelton. RT 488. Defense

United States District Court

For the Northern District of California

counsel also argued in closing that Thomas was an essential witness, particularly on the kidnapping charge and gun possession allegations, and that his testimony was not reliable because he had difficulty remembering details.  RT 1147.

Respondent contends that the jury was aware of Thomas's head injury and suggests that the prosecution's undisclosed arrangement to postpone Thomas's psychiatric evaluation was merely cumulative impeachment evidence.  *See* Opp. at 15.  However, evidence of Thomas's attorney's agreement not to have him examined before Shelton's trial "would have provided the defense with a new and different ground of impeachment" than the attacks on Thomas's credibility or forthrightness.  *Benn*, 283 F.3d at 1056.  As the court held in *Silva II*, "the undisclosed evidence was not duplicative of the impeachment evidence actually presented, but rather was of a different kind" because the deal regarding Thomas's psychiatric evaluation would lead jurors to question the reliability of Thomas's testimony and his competence to testify.  416 F.3d at 989.  Further, evidence of the prosecution's secret deal would have shown that the prosecutor himself harbored doubts about Thomas's competency.  *Id.*  Thus, Shelton has satisfied the first inquiry under *Gonzalez* by demonstrating a reasonable probability that the new evidence would have affected the jurors' view of Thomas's testimony.

**ii.    Reasonable Probability of Different Outcome**

To establish materiality of the Thomas impeachment evidence, Shelton must demonstrate a reasonable probability that disclosure would have resulted in a different verdict.  *Gonzalez*, 667 F.3d at 982.  Shelton argues that Thomas provided damaging testimony on the critical element of intent for kidnapping and murder, as well as the taking and disposal of the victims' property to support the theft conviction.  The record demonstrates, however, that because Shelton waived his rights and gave several interviews with investigators before testifying at his own trial, sufficient evidence of intent was introduced through Shelton's own incriminating statements and written notes. Shelton's admissions, as well as physical and fingerprint evidence, also supported the conviction for theft of Thorpe's and Craig's property.

United States District Court
For the Northern District of California

### A.   Drug and Alcohol Use

Shelton argues that Thomas contradicted Shelton's account to investigators and at trial that he was under the influence of drugs and alcohol when the crimes were committed. Shelton initially told investigators that he was sober when Craig was killed and had only been taking dope.  RT 712.  In later interviews, Shelton told investigators that he, Silva and Thomas were screwed up from drinking heavily and using drugs.  RT 798.  At trial, Shelton testified that on the day that Craig was killed, he had taken valium and smoked pot, but did not take a lot of drugs. RT 915, 962, 964-65.  To explain the discrepancy with his earlier statement to investigators that "neither he nor Ben have snorted any narcotics, had not shot any narcotics with a needle into their bodies, had not drank any alcohol and had only smoked marijuana cigarettes that day," Shelton testified that his earlier statement was "basically true" because "you don't shoot or snort valiums," which are taken in pill form.  RT 960.  Shelton also testified that from the time Silva came to live at his property, Shelton took speed, cocaine, "reds," valium and pot. RT 913-14.  He testified that on the day of the kidnapping, he had not taken any drugs during the day, but that night, he and Silva took valium and "reds" and drank whisky, while Thomas only took speed.  RT 913-14.

Shelton testified that he still felt the effects of taking speed two months later while he was in jail.  RT 929.  In his January 31, 1981 interview, Shelton also mentioned that after the victims were murdered, he and his family stayed at a hotel in Sacramento that was occupied by a group of Hell's Angels who were "all on drugs and speed."  RT 556, 559. Shelton testified that when he stayed at the hotel in Sacramento, before turning himself in, he took "a lot," or even "too much," speed."[2]  RT 915, 971, 1007.

Thomas contradicted Shelton's account of drug and alcohol use during the commission of the crimes by testifying that they did not have anything to drink on the night of the kidnapping, that there were no drugs in Shelton's cabin, and that neither Shelton,

---

[2]   During an interview with an investigator, Shelton suggested that the Hell's Angels "fed me all sorts of drugs to make me crazy cause they wanted me to go crazy and they were hoping I would but I kept it together."  RT 619.

United States District Court
For the Northern District of California

1   Thomas nor Silva had consumed drugs or alcohol.  RT 351.  Shelton suggests that

2   Thomas's testimony was crucial to negating Shelton's defense theory that he was too high

3   on drugs to have the requisite intent to commit the crimes for which he was convicted.

4   However, there was sufficient evidence presented at trial, even without Thomas's

5   testimony, to impeach Shelton's self-serving account of drug use during the time of the

6   crimes.  Shelton undermined his own credibility through his inconsistent statements about

7   his sobriety when Craig was killed: first, that he was sober and had only taken dope; then,

8   that from the night of the kidnapping to when Craig was killed a few days later, he had been

9   drinking heavily and using drugs; and finally, that on the day Craig was killed, he had taken

10  valium as well as smoked pot but didn't take a lot of drugs.  The investigators who

11  interviewed Shelton pointed out the inconsistencies in his statements, as the prosecution

12  emphasized at trial.  RT 962-63.  Even more damaging to Shelton's credibility were the

13  notes he passed to Thomas while they were incarcerated at the same jail, which included

14  the following statements:

> "Well, now, I'll tell you the story the lawyer in San Fran said would work, and if this works he said he could get you off, so that should work.  Here it is.  Read it.  Memorize it.  And stay with it.  Hopefully the cops won't know til I get out."  RT 511.
>
> "Tell them you were on drugs Ben gave to you."  RT 514.
>
> "I lied to Callegari like crazy so his case against us is all messed up."  RT 517.

20  The trial court instructed the jury on the diminished capacity defense:

> If you find from the evidence that at the time the alleged crime was committed, the defendant had substantially reduced mental capacity, whether caused by mental illness, mental defect, intoxication, or any other cause, you must consider what effect, if any, this diminished capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder and voluntary manslaughter.
>
> Thus, if you find that the defendant's mental capacity was diminished to the extent that you have a reasonable doubt whether he did, maturely and meaningfully, premeditate, deliberate, and reflect upon the gravity of his contemplated act, or form an intent to kill, you cannot find him guilty of a willful, deliberate and premeditated murder of the first degree.

United States District Court

For the Northern District of California

1    Also, if you find that the defendant's mental capacity was
2    diminished to the extent that you have reasonable doubt whether he
     was able to form the mental states constituting either express or
     implied malice aforethought, you cannot find him guilty of murder of
3    either the first or second degree.

4    If you have a resaonable [sic] doubt (1) whether he was able
     to form an intention unlawfully to kill a human being, or (2) whether
5    he was aware of the duty imposed on him not to commit acts which
     involve the risk of grave injury or death, or (3) whether he did act
6    despite that awareness, you cannot find he harbored express malice.

7    Further, if you have a reasonable doubt (1) whether his acts
     were done for a based, anti-social purpose, or (2) whether he was
8    aware of the duty imposed on him not to commit acts which involve
     the risk of grave injury or death, or (3) whether he did act despite that
9    awareness, you cannot find that he harbored implied malice.

10   Furthermore, if you find that as a result of mental illness,
     mental defect, or intoxication, his mental capacity was diminished to
11   the extent that he neither harbored malice aforethought  nor had an
     intent to kill at the time the alleged crime was committed, you cannot
12   find him guilty or [sic] either murder or voluntary manslaughter.

13   When a defendant is charged with a crime which required that
     a certain specific intent or mental state be established in order to
14   constitute the crime or degree of crime, you must take all the
     evidence into consideration and determine therefore if, at the time
15   when the crime allegedly was committed, the defendant was
     suffering from some abnormal mental or physical condition, however
16   caused, which prevented him from forming the specific intent or
     mental state essential to constitute the crime or degree of crime with
17   which he is charged.

18   If from all the evidence you have a reasonable doubt whether
     defendant was capable of forming such specific intent or mental
19   state, you must give defendant the benefit of that doubt and find that
     he did not have such specific intent or mental state.

20   . . .

21
22   If the evidence shows that the defendant was intoxicated at
     the time of the alleged offense, the jury should consider his state of
23   intoxication in determining if defendant had such specific intent.

RT 1193-95, 1197.

24
25   In light of the entire record, there is no reasonable probability that disclosure of the

impeachment evidence against Thomas either would have led jurors to believe Shelton's
26
inconsistent account of drug and alcohol use so as to find diminished capacity, or would
27
have otherwise resulted in a different outcome at trial.  The jury found Shelton guilty of the
28

24

United States District Court

For the Northern District of California

1    first degree murder of Thorpe and the second degree murder of Craig, as well as their

2    kidnapping, grand theft of Thorpe's property and petty theft of Craig's property.  RT 1232-

3    37.  The jury's verdict reflected a finding that Shelton's capacity was not so diminished by

4    drugs or alcohol that he was unable to form the necessary intent to commit the crimes.

5    Because the record demonstrates that Shelton was himself not a credible witness, it is not

6    reasonably probable that the jury would have believed Shelton's self-serving and

7    exaggerated account that he was so drunk and/or impaired by drugs that he didn't know

8    what he was doing when Thorpe and Craig were kidnapped, robbed and murdered.

9                              **B.    Kidnapping**

10          In support of his *Brady* claim, Shelton argues that Thomas provided critical evidence

11   of Shelton's intent to kidnap the victims.  The record demonstrates, however, that

12   Thomas's testimony which Shelton challenges was corroborated by Shelton himself or by

13   other evidence introduced at trial to establish the intent to kidnap.

14          Thomas testified that Shelton and Silva had discussed bringing a female to Shelton's

15   property and then having to kill her.  RT 316.  Thomas also testified that when he, Silva and

16   Shelton saw the victims at the Madeline Café, Silva said to them that he was going to take

17   them.  RT 321.  According to Thomas's account of the plan to kidnap Thorpe and Craig,

18   Silva initially planned that he and Shelton would walk up to the car after pulling over the

19   victims with the fake police light, but Shelton objected because he was too well known in

20   that area.  RT 321-22.  They decided that Shelton and Thomas should switch roles, so that

21   Thomas and Silva would approach the victims' car, and Shelton would follow them in

22   Silva's truck.  RT 322.  Shelton, on the other hand, testified that he refused to be any part

23   of the kidnapping, and that Thomas called Shelton "chicken" and told Silva that he would do

24   it.  RT 942.  As the prosecutor pointed out on cross-examination, Shelton's account of

25   telling Silva that he would not help Silva kidnap the couple was inconsistent with his earlier

26   testimony that he would never say "no" to Silva out of fear that Silva would kill him or his

27   family.  RT 874, 987.  Shelton also recalled waiting on the highway in Silva's pickup truck

28

United States District Court

For the Northern District of California

1  for the victims' car to pass, and hearing Silva and Thomas yell "there it goes," but that he

2  didn't see it and was "just sitting there."  RT 940.

3       Shelton argues that if Thomas's testimony about the premeditated kidnapping had

4  been excluded or substantially impeached with the evidence of the prosecutor's

5  arrangement concerning the timing of Thomas's psychiatric evaluation, then Shelton's

6  defense to the kidnapping would have been much stronger, i.e., that he was in a drug-

7  induced haze and that he was scared of Silva and coerced into following along with Silva's

8  plans.  Traverse at 15.  Shelton's own statements, however, confirmed much of Thomas's

9  account of the kidnapping.  Though the prosecutor noted several inconsistencies in

10  Shelton's earlier statements and his trial testimony, the record demonstrates that Shelton

11  admitted during a police interview to having conversations with Silva and Norman about

12  kidnapping a woman.  RT 707.  Further, Shelton admitted that he was with Silva when Silva

13  purchased a red spotlight.  RT 858-59.  Shelton testified at trial that he broke the spotlight

14  when he stepped on it, and that Silva bought another red spotlight on his own.  RT 859.

15  Shelton's own testimony indicates that he knew of a plan to pull over unsuspecting victims

16  with a fake police light, which supports a finding of intent.

17       With respect to Shelton's coercion defense, his own testimony did not support his

18  theory that he acted out of fear.  Even without Thomas's testimony about the kidnapping

19  plan, Shelton's own admissions supported a finding that he willingly participated in the

20  kidnapping and did not escape or defend himself against Silva when he had the chance.

21  Shelton admitted that he alone drove Silva's truck, following Silva and Thomas in the

22  victims' car in the course of the kidnapping.  RT 862.   With respect to being armed during

23  the kidnapping, Shelton admitted during a police interview that he was "always armed,"

24  suggesting that he did so because he was afraid of Silva.  RT 619.  Shelton told an

25  investigator that Silva gave him a .44 Magnum at the time of the kidnapping.  RT 715.  At

26  another interview, Shelton stated that he may have had a .44 Magnum when the victims

27  were kidnapped, but was not sure.  RT  797.  Then at trial, Shelton testified that on the

28  night of the kidnapping, he didn't have any kind of firearm.  RT 861.  Shelton denied that he

26

had Silva's .44 Magnum on the night of the kidnapping, admitting only that it was normally kept on the dashboard, but testified that the gun was not even with him on the dashboard of the truck at the time of the kidnapping.  RT 861, 950, 952.  Because Shelton's inconsistent statements about his role in the kidnapping and about being armed were not credible, it is not reasonably probable that the undisclosed evidence to impeach Thomas would have resulted in a different verdict on the kidnapping charges.

### C.    Thorpe's Murder

Shelton argues that Thomas's testimony was critical on the issue of Shelton's intent to kill Thorpe.  Thomas testified that Shelton and Silva chained Thorpe to a tree to stay outside all night, while Shelton fingered Thomas as Silva's accomplice in chaining up the victim.  Thomas also testified that he brought Thorpe a sleeping bag, whereas Shelton claimed that he was the one who brought the sleeping bag to the victim.  RT 354, 868. Shelton argues unpersuasively that the factual dispute over who gave the victim a sleeping bag "out of mercy" while he was chained to a tree was material to the issue of Shelton's intent to kill Thorpe, and that the jury's evaluation of this factual dispute could have been affected by the improperly withheld impeachment evidence.  Traverse at 11-12 n.7.  In light of the overwhelming evidence of Shelton's role in Thorpe's death, the disputes over whether it was Thomas or Shelton who helped Silva chain Thorpe to a tree, or who brought a sleeping bag to the victim on the eve of his murder, are not material to the issue of Shelton's premeditated intent to murder Thorpe.

Shelton admitted that he was with Silva when they unchained Thorpe from the tree and walked him up the hill, where he was murdered.  RT 733-34.  In his defense, Shelton testified not only that was he scared of Silva and confused from excessive drug use, but that he thought he was walking Thorpe up the hill to be taken out of view from the road and that he didn't know that Thorpe was going to be killed.  RT 869-70.  Shelton testified that he was not armed when he walked Thorpe up the hill to the place where he would be murdered.  RT 870.  Thomas testified, however, that on the morning that Thorpe was murdered, Shelton was armed with a .44 Magnum and left the cabin with Silva.  RT 373,

United States District Court
For the Northern District of California

358.  Thomas also testified that after Thorpe was killed, Shelton told him that he stayed with Thorpe while Silva went to Thomas's trailer to get the Ingram automatic weapon, and that when Silva returned with the Ingram, Shelton hid behind a rock or a log to avoid being shot himself.  RT 373-73.  Shelton admitted that he "jumped behind a tree when the bullets started flying."  RT 872.  Thomas also recalled that Shelton told him that Thorpe was crying and that Shelton told him to look at the mountain because it was the last thing he would see.  RT 372.

Shelton contends that Thomas's testimony contradicted the defense theory that Shelton believed that Silva went to the trailer to retrieve more chains, not an automatic weapon, and that Shelton was surprised when Silva opened fire on Thorpe.  Traverse at 14.  Thomas's account of what Shelton told him certainly provided details about Thorpe's final moments that Shelton did not testify about himself, and was not merely cumulative evidence.  In the context of Shelton's own admissions, however, Thomas's testimony provided additional facts that connected Shelton to Thomas's murder, but was not "'the glue that held the prosecution's case together.'"  *Rhoades v. Henry*, 598 F.3d 495, 504 (9th Cir. 2010) (citing *Horton v. Mayle*, 408 F.3d 570, 579 (9th Cir. 2005)).  Shelton's admissions that he accompanied Silva in walking Thorpe up the hill, guarded Thorpe in Silva's absence, and jumped behind a tree to avoid being shot while Silva fired at Thorpe were sufficient to demonstrate that Shelton knew that Silva would kill Thorpe.  Further, Shelton admitted that he shot Thorpe with Silva's machine gun after Silva fired one and a half clips into the victim.  In light of these admissions and Shelton's inconsistent accounts of Thorpe's death, including his prior denial that he was even present when Thorpe was killed, it is not reasonably probable that the jury would have believed Shelton's testimony that he did not know that Silva would shoot and kill Thorpe.  RT 564, 714, 717-18.

Thomas also testified that on the morning Thorpe was killed, Shelton and Silva left the cabin to go outside.  Shelton returned to the cabin about ten minutes later to tell Thomas to turn on the stereo and went back outside.  RT 359.  Then, Silva returned to the cabin to tell Thomas to turn up the volume, which he did.  RT 359-60.  The prosecution

United States District Court

For the Northern District of California

1    argued that Shelton and Silva's instructions to Thomas to turn on the stereo loudly showed

2    an intent to drown out the sound of Thorpe being shot to death.  RT 1097.  Shelton

3    contends that Thomas's testimony established this factual element to support a finding of

4    intent, but the record demonstrates that Shelton's own prior statements established this

5    incriminating circumstance.

6         "A useful measurement of the importance of [the witness] and the materiality of the

7    withheld impeachment evidence is the lack of emphasis the prosecutor placed on his

8    testimony." *Barker v. Fleming*, 423 F.3d 1085, 1100 (9th Cir. 2005) (citing *Kyles*, 514 U.S.

9    at 444).  In Shelton's trial, the prosecutor relied primarily on Shelton's own statements as

10   evidence that he knew in advance that Thorpe would be killed and tried to cover up the

11   sound of gunshots by having Thomas turn on the stereo.  As the prosecutor argued in

12   closing, Shelton first denied that he was present when Silva shot Thorpe, and he told an

13   investigator that "Thomas and Silva came in and told me to turn the stereo up."  RT 709,

14   1096-97.  The prosecutor argued forcefully that in light of Shelton's later admission that he

15   did, in fact, accompany Silva in walking Thorpe up the hill and shooting him to death,

16   Shelton's earlier statement that Thomas and Silva told him to turn up the stereo made it

17   "almost obvious that he's putting Thomas in his position and what he's saying there is in

18   essence an admission that he was trying to lay at Thomas' feet an admission that he went

19   in there and he said turn up that stereo."  RT 1097.

20        In light of this record, the prosecution's failure to disclose its arrangement to

21   postpone Thomas's psychiatric examination does not undermine confidence in the verdict

22   of murder in the first degree of Kevin Thorpe.

### D.    Craig's Murder

24        To support his *Brady* challenge to his conviction for the second degree murder of

25   Laura Craig, Shelton argues that the undisclosed impeachment evidence was material

26   because Thomas's testimony about Shelton's role in her death was critical to establish

27

28

United States District Court

For the Northern District of California

intent.[3]  Shelton contends that the key issue for the jury was whether Shelton was actually surprised when Silva killed Craig and whether Shelton shared Silva's intent to kill her. Traverse at 16.  The record demonstrates, however, that Thomas's testimony was even less probative of the circumstances of Craig's death than of Thorpe's, and that Shelton's own admissions implicated him in Craig's murder.

Thomas testified that when Shelton and Silva left the cabin with Craig, he thought they were taking Craig to Oakland to see Sonny Barger, the leader of the Hell's Angels.  RT 388.  Thomas never saw Craig again, and he testified that Shelton later told him that when Silva stopped the truck to change drivers, Shelton got out of the truck and heard a shot and Craig's scream.  RT 392.  Thomas further testified that Shelton told him that Silva pulled Craig out of the truck by the hair and shot her in the back of the head.  RT 392.

Shelton's trial testimony corroborated Thomas's account for the most part, but he denied that he heard Craig scream after Silva first shot her.  RT 883.  Shelton told an investigator that he talked Silva out of killing Craig the night that Thorpe was killed, and testified that he knew that Silva wanted to kill her but he hoped to talk Silva out of it.  RT 803-04, 992.  Shelton admitted, however, that Silva told him that he would hit Craig in the head with a baseball bat, RT 713, 799, and that when they left Shelton's property with Craig, Shelton saw Silva put a baseball bat in the truck and felt ninety percent sure that Craig was being taken to be killed.  RT 799-800.  Shelton told investigators that he did not believe that Craig had much chance to escape or leave, RT 713, yet he admitted that at one point during the road trip, Silva stopped at a gas station where Silva went inside to buy a can of soda for Craig, while Shelton stayed in the truck with her.  RT 741-42, 998.  As the prosecutor argued in closing, Shelton knew that Craig's life was in danger, yet when Silva

---

[3]      The jury's verdict of murder in the second degree reflects a finding that there was insufficient evidence of deliberation or premeditation in killing Craig.  RT 1187.  The jury was instructed that second degree murder was "the unlawful killing of a human being as the direct causal result of an act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with wanton disregard for human life by which is meant an awareness of a duty imposed by law not to commit such acts followed by the commission of the forbidden act despite that awareness."  RT 1187.

United States District Court

For the Northern District of California

1   went into the store to buy a soda, Shelton didn't release Craig.  Rather, the prosecution

2   argued, Shelton stayed with Craig in the truck and prevented her from escaping while Silva

3   was in the store.  RT 1092.  By convicting Shelton of second degree murder, the jury

4   rejected defense counsel's argument that Shelton thought he could protect Craig by

5   reaching Sonny Barger to explain that Craig's brother was in a motorcycle gang.  RT 804,

6   1143.

7        Thomas testified that Shelton told him that he tried to remove rings from Craig's

8   fingers to give to his wife, RT 394, but there was no evidence that Shelton actually took

9   Craig's jewelry, RT 629.  Although Shelton argues that Thomas's testimony supported the

10  prosecution's theory that Shelton was a cold-blooded killer, Thomas's testimony did not

11  directly inform the question of Shelton's intent to kill Craig, whereas Shelton's own

12  admissions demonstrated his state of mind when he left his cabin with Silva and Craig on

13  the day she was killed.  *See Smith v. Almada*, 640 F.3d 931, 940 (9th Cir. 2011) (affirming

14  summary judgment against § 1983 claimant who alleged *Brady* violation, finding that

15  nondisclosure of evidence to impeach witness who helped establish motive in criminal

16  arson trial was not material where prosecution presented strong physical evidence and an

17  officer's testimony that the suspect made an admission to him about having a dispute with

18  the victim).  As the prosecutor argued in closing, Shelton was responsible for aiding and

19  abetting Silva, who directly and actively shot Craig, by holding her captive for three or four

20  days and by keeping her in the car "while Ben Silva gets the Pepsi" the day she was killed.

21  RT 1100.  The Thomas impeachment evidence at issue here does not, therefore,

22  undermine confidence in the jury verdict.

23                      **E.     Theft**

24       With respect to his theft convictions, Shelton contends that Thomas's testimony

25  tended to implicate Shelton in taking and disposing of the victims' property.  Thomas

26  testified that Shelton and Silva unhitched the victims' trailer from their car, and that they

27  brought in a camera and papers from the victims' car.  RT 342-43, 350.  Shelton contends

28  that Thomas contradicted the defense theory that Silva and Thomas were responsible for

United States District Court

For the Northern District of California

taking the victims' property and that Shelton did not participate in a robbery.  RT 1141.

Even without Thomas's testimony, however, Shelton's own admissions and inconsistent

trial testimony, as well as the forensic evidence presented at trial, supported the conviction

for the offenses of grand theft and petty theft.[4]

When he turned himself in, Shelton was wearing a pair of Thorpe's boots which he

took from the victims' trailer, as he admitted to an investigator.  RT 567-68.  At trial,

however, Shelton testified that it was Silva who gave him the boots.  RT 1011.

Furthermore, Shelton's fingerprints were found on the stereo taken from the victims' car

and found in his cabin.  RT 651.  At trial, Shelton testified that Silva handed the stereo to

him and that he simply put it in a cabinet.  RT 988.  Shelton also admitted to investigators

that about $1500 had been taken from the victims, and that Silva gave Shelton $100 and

used about $200 to pay Shelton's gas bill, although Shelton wasn't sure that the money

was actually taken from the victims.  RT 565, 745, 800.  At trial, Shelton only recalled that

Silva gave him one hundred dollars "sometimes," but testified he was unsure where the

money came from.  RT 876.

Shelton also admitted that when they reached his property after kidnapping Thorpe

and Craig, Silva ordered the victims to get out of their car and get on the back of Silva's

pickup truck, which Shelton drove down the hill toward his cabin, thereby removing the

---

[4]   The trial court instructed the jury on robbery and the lesser offense of theft:

> The crime of robbery is the taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear. . . .

> The theft of personal property of any value from the person of another is grand theft.  To constitute the taking of property from the person, the property must be either on the body or in the clothing being worn, or in a receptacle being carried by the person from who[m] it is taken.

> When property such as that alleged to be involved in this case is taken by theft, if the value of the property exceeds two hundred dollars, the crime is grand theft; . . . if the value is two hundred dollars or less, the crime is petty theft.

RT 1204-05.

United States District Court

For the Northern District of California

1  victims from their car and trailer with all their possessions, as the prosecutor argued in

2  closing.  RT 1112.  This part of Shelton's account was consistent with Thomas's testimony

3  that when they stopped at Shelton's property, Silva made the victims sit on the back of the

4  truck that Shelton drove, stopping near his cabin, while Thomas drove the victims' car to

5  the end of the road.  RT 338-39.

6        Thomas also testified that Shelton told him where to find the victims' trailer, which

7  had been moved, and to cover it with brush, contradicting Shelton's testimony suggesting

8  that he did not know how the victims' trailer ended up on the hill.  RT 380, 867-68.  This

9  factual dispute over whether Shelton was involved in moving the victims' trailer from one

10 point on his property to another does not undermine confidence in the outcome of the trial,

11 where there was ample evidence, including Shelton's own admissions, that he took the

12 victims' property.  In light of this record supporting the conviction for grand theft and petty

13 theft, there is no reasonable probability that disclosure of the impeachment evidence

14 concerning the agreement to delay Thomas's psychiatric evaluation would have resulted in

15 a different verdict.

16       Shelton has failed to demonstrate that the state court's denial of his *Brady* claim was

17 an unreasonable application of clearly established federal law.  His claim for habeas relief

18 pursuant to *Brady* is therefore DENIED.

19 **D.    Ineffective Assistance**

20       Shelton also claims that he was denied the effective assistance of counsel when his

21 trial attorney failed to uncover the district attorney's deal with Thomas's attorney.  Applying

22 the *Strickland* framework for analyzing ineffective assistance of counsel claims, Shelton

23 has not demonstrated that counsel's performance fell below an "objective standard of

24 reasonableness" under prevailing professional norms.  *Strickland v. Washington*, 466 U.S.

25 668, 687-88 (1984).  There is no dispute that Thomas's attorney did not disclose the facts

26 underlying Shelton's *Brady* claim until after Shelton's conviction.  Opp. at 15 n.3.  Shelton

27 agrees with respondent's argument that no amount of investigation by trial counsel would

28 have revealed the secret agreement between Thomas and the prosecutor, laying the fault

**United States District Court**
For the Northern District of California

1  for the non-disclosure of the Thomas competency evidence on the prosecution alone.

2  Traverse at 24.  Thus, Shelton has not shown that his trial attorney's performance was

3  deficient under the first *Strickland* prong.

4        Having failed to establish materiality under *Brady*, Shelton has also failed to show

5  that he was prejudiced by any deficient performance under the second *Strickland* prong,

6  i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the

7  result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  "The

8  analysis of materiality for ineffective assistance of counsel is the same as the analysis of

9  prejudice for *Brady*, *see United States v. Bagley*, 473 U.S. 667, 682 (1985), so the *Brady*

10  prejudice analysis applies directly to this ineffective assistance of counsel claim."

11  *Gonzalez*, 667 F.3d at 1002 n.7.  Habeas relief for Shelton's ineffective assistance claim is

12  also, therefore, DENIED.

13  **E.    Evidentiary Hearing**

14        Shelton requests an evidentiary hearing on disputed issues of fact.  "In deciding

15  whether to grant an evidentiary hearing, a federal court must consider whether such a

16  hearing could enable an applicant to prove the petition's factual allegations, which, if true,

17  would entitle the applicant to federal habeas relief," in light of the deferential standards

18  prescribed by § 2254.  *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (citation omitted).  "It

19  follows that if the record refutes the applicant's factual allegations or otherwise precludes

20  habeas relief, a district court is not required to hold an evidentiary hearing."  *Id.* at 474.

21  Here, the state court record was sufficient to determine the materiality of the undisclosed

22  Thomas impeachment evidence at issue.  The request for an evidentiary hearing is

23  therefore DENIED.

24                                         **CONCLUSION**

25        For the reasons set forth above, Shelton's petition for a writ of habeas corpus is

26  DENIED.  This order fully adjudicates the petition and terminates all pending motions.  The

27  clerk shall close the file.

28

United States District Court

For the Northern District of California

**CERTIFICATE OF APPEALABILITY**

To obtain a certificate of appealability, Shelton must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward. "The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Section 2253(c)(3) requires a court granting a COA to indicate which issues satisfy the COA standard. Here, the court finds that the following issue presented by Shelton in his petition meets that standard: whether the prosecution's undisclosed agreement with Thomas's attorney to postpone Thomas's psychiatric examination until after he testified in Shelton's trial was material under *Brady*. Accordingly, the court GRANTS the COA as to that issue. *See generally Miller-El*, 537 U.S. at 322.

The clerk shall forward the file, including a copy of this order, to the Court of Appeals. *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).

**IT IS SO ORDERED.**

Dated: April 8, 2013

_____
PHYLLIS J. HAMILTON
United States District Judge